No. 79-21

IN THE SUPREME COURT OF THE STATE OF MONTANA

1980

BONNIE J. GORDON,

Claimant and ~~Appellant~~ *Respondent*,

vs.

H. C. SMITH CONSTRUCTION COMPANY,
Employer, and ARGONAUT INSURANCE
COMPANY,

Defendants and ~~Respondents~~ *Appellants*.

Appeal from: Workers' Compensation Court
Honorable William E. Hunt, Judge presiding.

Counsel of Record:

For Appellant:

Harris, Jackson and Murdo, Helena, Montana
L. V. Harris argued, Helena, Montana

For Respondents:

Garrity, Keegan and Brown, Helena, Montana
Thomas M. Keegan argued, Helena, Montana

For Amicus Curiae:

Hilley and Loring, Great Falls, Montana
Emilie Loring argued, Great Falls, Montana

Submitted: February 22, 1980

Decided: MAR 27 1980

Filed: MAR 27 1980

Thomas J. Kearney
Clerk

Mr. Justice Gene B. Daly delivered the Opinion of the Court.

This is an appeal by the employer, H. C. Smith Construction Co., and compensation carrier, Argonaut Insurance Co., from the findings of fact, conclusions of law, and judgment of the Montana Workers' Compensation Court, the Honorable William E. Hunt presiding, entered on behalf of claimant Bonnie J. Gordon upon a finding that the death of her husband, John N. Gordon, arose out of and within the course of his employment.

John N. Gordon, age 33, was employed as an electrician by H. C. Smith Construction Co. on various missile sites in the area of Denton, Montana. During the fourteen months of his employment by H. C. Construction Co., his permanent residence was at Butte, Montana, where his wife, the claimant in this case, and four minor children reside. From March 20, 1978, to the date of his death, May 1, 1978, Gordon's temporary residence was the Brand T Motel in Lewistown, Montana. On May 1, 1978, he was still registered as a guest at the motel and was sharing a room with a fellow employee whose permanent residence was also in Butte.

On Sunday, April 30, 1978, Gordon returned to the motel in Lewistown after spending the weekend with his family in Butte. On the morning of May 1, 1978, he drove his pickup truck from Lewistown to the jobsite approximately 24 miles northeast of Denton, Montana, where he was working a 7:00 a.m. to 5:30 p.m. shift.

The events that occurred on May 1, the day Gordon was killed, are summarized in the Workers' Compensation Court's findings of fact:

> "10. John N. Gordon was an electrician and he
> worked on May 1, 1978 with fellow electricians
> James Peters and James Walding. The employees

sometimes got off work early and on May 1, 1978 Gordon, Peters and Walding got off no later than 5:30 p.m. and possibly earlier. James Peters and James Walding left the job site in a pickup truck belonging to James Peters. John N. Gordon left the job site alone in his own pickup. From the job site, the three drove the approximate 24 miles to Denton, Montana, where they met at the Denton Bar. They arrived at the Denton Bar no later than 6:00 p.m. and possibly as early as 5:30 p.m.

"11. At the Denton Bar, Gordon, Peters and Walding joined other fellow employees in drinking and playing pool. They continued in these activities for some four to four and one-half hours. No food was served in the bar, other than snacks, and the three employees did not eat a meal at the bar or elsewhere.

"12. At about 10:00 p.m. May 1, 1978, Gordon, Peters and Walding left the Denton Bar together. Gordon did not leave in his own pickup in which he had come, but accompanied Peters and Walding in Peters' pickup. From the Denton Bar the three traveled west on State Primary Highway 81. About 2.3 miles west of Denton, Peters' pickup went off the road and John N. Gordon and James Walding were instantly killed. James Peters was slightly injured and survived.

"13. A highway patrolman and a Fergus County deputy sheriff investigated the one-car accident and the patrolman determined that the accident resulted from speed and alcohol involvement. <u>Blood alcohol tests were taken and the blood alcohol content on Walding was found to be .12, and on Peters .06. The blood sample on John N. Gordon leaked and no result was obtained.</u>" (Emphasis added.)

The terms of John N. Gordon's employment were controlled by a union contract of the Great Falls Division, Montana Chapter, National Electrical Contractors Association and Local Union No. 122, International Brotherhood of Electrical Workers, Great Falls, Montana. He was earning in excess of $500 per week, not including overtime. In addition to his wages, he received a $22 per day subsistence allowance for working at the job site more than 54 miles from Great Falls.

Article III, Section 18, of the Union Agreement states:

"No travel time or travel allowance shall be required of the Employer before or after working

hours to any employee for traveling to or from any job located within a four (4) mile radius of Second Avenue at 15th Street North, Great Falls, Montana, plus the entire fenced boundaries of Malmstrom Air Force Base, immediately east of Great Falls, and all of Great Falls International Airport, when employees are ordered to report on the job.

"On jobs between the perimeter of the four (4) mile radius and fifty-four (54) road miles from Second Avenue at 15th Street North, Great Falls, Montana except Malmstrom Air Force Base and Great Falls International Airport, employees shall be allowed a travel allowance as follows: Effective 3-1-78 twenty-two cents (22¢); Effective 3-1-79 twenty-three cents (23¢) per road mile from the perimeter of the four (4) mile radius circle each way, per day worked.

"On jobs in excess of fifty-four (54) road miles from Second Avenue at 15th Street North, Great Falls, Montana, the employee shall receive twenty-two dollars ($22.00) effective 3-1-78 and twenty-three dollars ($23.00) effective 3-1-79 subsistence per day worked in lieu of any travel time or travel allowance. . .

"The employees will transport their own tools and furnish their own transportation and travel on their own time reporting to the job and put in eight (8) hours on the job . . .

"On jobs having multiple jobsite locations, the Employer shall designate the location to which each workman shall report and each workman shall report on his own time and in his own transportation." (Emphasis added.)

Bonnie J. Gordon, widow of the decedent, filed a claim for death benefits under the provisions of the Workers' Compensation Act on behalf of her children and herself. After Argonaut Insurance Co. summarily denied her claim on November 21, 1978, Mrs. Gordon petitioned the Workers' Compensation Court for an order granting her claim. After a hearing on February 27, 1979, the court issued findings of fact and conclusions of law and judgment on July 6, 1979, which held that decedent's death arose out of and in the course of his employment and that claimant and her four minor children were entitled to workers' compensation death benefits.

Appellants present two substantive issues on appeal:

1. Did the payment to decedent of $22 per day "subsistence" according to the labor contract under which he was employed constitute travel pay so as to entitle claimant to worker's compensation benefits under an exception to the "going and coming" rule?

2. Did John N. Gordon "deviate" from the course of his employment by stopping at the Denton Bar for approximately four hours and by traveling in a direction which was opposite to that of his Lewistown motel room when he left the bar and was killed in an automobile accident?

We have in past cases explained the foundation principles that justify the application of an exception to the "going and coming" rule. The "going and coming" rule states that travel by an employee to and from work is generally regarded as outside the course and scope of employment. The leading Montana cases establishing an exception to this rule are McMillen v. McKee & Co. (1975), 166 Mont. 400, 533 P.2d 1095, 1098, and Ellingson v. Crick Co. (1975), 166 Mont. 431, 533 P.2d 1100, 1101. The exception and its rationale are summarized in McMillen, 533 P.2d at 1098, quoting 1 Larsen, Workmen's Compensation Law, §16.30:

> "However, in the majority of cases involving a deliberate and substantial payment for the expense of travel, or the provision of an automobile under the employee's control, the journey is held to be in the course of employment. This result is usually correct because when the subject of transportation is singled out for special consideration it is normally because the transportation involves a considerable distance and therefore qualifies under the rule herein suggested: that employment should be deemed to include travel when travel itself is a substantial part of the service performed. The sheer size of the journey is frequently the principal fact supporting this conclusion . . ."

The facts in McMillen were almost identical to those in this case. Employees were paid a travel allowance based on a sliding scale, not an actual mileage rate, and the parties had referred to the pay as "travel pay or subsistence" while here the reference is to "subsistence . . . in lieu of . . . travel allowance." In both cases the payment is for travel, no matter what the parties may have selected to call it. In other words, the superficial distinctions in the contract or the labels attached to benefits contained therein are not the primary consideration. Because the union contract singles out for special consideration a travel allowance and it is paid as an incentive to get men onto jobs and results in a reasonable benefit to an employer, then while the employee is "traveling" en route to or from work, any injury is within the exception and arises out of and in the course and scope of employment.

In determining that the injuries in Ellingson arose out of and in the course of employment, we refused to distinguish McMillen on the basis of differences in the contractual methods of computing the respective travel allowances, stating:

> "In McMillen, the computation was predicated upon the miles actually traveled by the individual employee, while here it is based on the distance from the job site to the nearest county courthouse. The disparity results in McMillen employees receiving varying amounts of compensation depending on the distance traveled, while the employees here all received a uniform amount.

> "We cannot see where that distinction varies the applicability of the test enunciated in McMillen. The fact that the travel allowance here was based on a distance other than mileage between residence and job site is not important. The union contract singled out transportation as the subject of a specific allowance. When transportation is thus singled out in the employment contract, the

-6-

> travel to and from work is brought within
> the course of employment. Injuries sustained
> en route are therefore compensable. McMillen,
> supra; 1 Larsen, Workmen's Compensation Law,
> §16.30." 533 P.2d at 1101. (Emphasis added.)

Appellant insurance carrier, relying on Majors v. Lewis and Clark County (1921), 60 Mont. 608, 201 P. 268, claims that subsistence has a restricted meaning, limited to support. Majors was not a workers' compensation situation and did not involve the use of the word "subsistence" when it is clear from the context that both parties meant travel pay. In Majors the issue was the interpretation to be given to words in carefully drafted state and federal legislation. Federal law provided the United States would pay for the "subsistence" of federal prisoners in local jails and also pay fifty cents per month per prisoner for the use and upkeep of the jail.

The test to be applied to determine coverage under the exception to the rule really becomes a simple matter of substance over form. In this instance there can be no question that the underlying consideration singled out in the contract was travel and coverage is proper.

Argonaut further contends that John Gordon's death is not compensable because he stopped at Denton for a time and afterwards proceeded toward Stanford and not Lewistown where he maintained a motel room by the month.

It is uncontradicted from the testimony at the hearing that it was John Gordon's custom and habit to often stay in Stanford with fellow employees instead of returning each night to Lewistown. It was also proved that there were absolutely no company restrictions in this regard and he would be covered heading for either Stanford or Lewistown. Roger Wingard testified that the company did not care where its

-7-

employees spent the night, be it Stanford, Lewistown or "Timbuktu." All the company cared about was that they show up at work on time and put in a full day.

The language of Montana cases is clear that travel to and from work is covered and that injuries sustained en route are compensable. The evidence supports the conclusion that John Gordon was traveling from work and was killed en route to Stanford where he was going to spend the night as he had done in the past. There was no requirement either oral or written that he go to Lewistown. To carry Argonaut's argument to its logical conclusion, if John Gordon were driving to work the next morning from Stanford, and he was killed before he reached Denton, then his death would not be compensable.

Argonaut produced nothing of substance to refute the fact that John Gordon was proceeding to Stanford for the night as was his custom at times. A "white horse witness," found by a company official but never identified or produced at the hearing, purportedly told the official that he, the witness, had overheard a conversation of Gordon, Peters and Walding outside the Denton Bar discussing which one would drive to Stanford to get a steak. This testimony by the company official, being hearsay upon hearsay, is questionable in any light; but the insurer's inability to identify or produce or excuse nonproduction of the first hearsay conduit casts further doubt on the probative value of the testimony. The alleged statement supposedly refers to getting a steak at the "Sundown Inn" at Stanford, implying an intent to go out for dinner. This is not relevant in the first instance because even if that were true, Gordon was at the same time traveling while en route from work.

The question of deviation raised by the insurer is, of course, its to prove. Steffes v. 93 Leasing Co. (1978), ___ Mont. ___, 580 P.2d 450, 454, 35 St.Rep. 816, citing Blair, Reference Guide to Workmen's Compensation Law, §9.25. The appellants mixed alcohol into the proceedings; however, if this was relevant, it would not be a major concern as no one was intoxicated. As a practical matter, Walding had 0.12 percent blood alcohol, which only said he has a legislative presumption of under the influence since the legislature selected to reduce the blood level of presumption from 0.15 to 0.10 several years ago. Peters had 0.06 percent blood alcohol, which does not give rise to any presumption and which, as a practical matter, reflected very little consumption. There was no reading obtained on John Gordon and no evidence of over-indulgence on his part.

Even if there were evidence that Gordon was legally intoxicated at the time of his death, which we emphasize there was not, we have held that that fact alone does not establish a deviation from the course of employment. Steffes v. 93 Leasing Co., supra. In any case, it cannot come as a great shock to the employer or be unforeseeable by the insurer that working men away from their homes and families may visit a saloon for a beer after work. Again, in arguing that stopping at the Denton Bar constitutes a disqualifying deviation, the insurer is attempting to interject fault into a no fault system.

Workers' compensation legislation is the original no fault insurance. If an employee performs his job negligently and is killed as a result, his death is compensable. If a fellow employee negligently causes another employee's death, that is also compensable. The risk insured here,

-9-

i.e., the possibility that a worker may be involved in a fatal automobile accident while en route from work, is exactly the risk contemplated by McMillen and Ellingson. What would the insurer here argue if John Gordon had stopped to eat his supper and then resumed his journey and been killed?

Argonaut's contention of deviation could only be considered if John Gordon had been killed in the Denton Bar, but that question is not before this Court. Rather, this case falls squarely within the McMillen holding and presents no true deviation question. The risk of travel is what was insured against, and when John Gordon was killed while traveling from his job, his death was compensable.

Assuming, arguendo, that the stop at Denton did present a true deviation question relevant in some way to our case, i.e., what is the conduct of a reasonable man, in this case a boomer electrician, miles out into a rural area, without his family, when it concerns stopping at Denton, Montana, for a beer and a game of pool after completing his work day? It could be said here that the conduct comported with the general requirements for all persons as stated by Professor Larson:

> "An identifiable deviation from a business trip for personal reasons takes the employee out of the course of his employment until he returns to the route of the business trip, unless the deviation is so small as to be disregarded as insubstantial. In some jurisdictions, the course of employment is deemed resumed if, having completed his personal errand but without having regained the main, business route, the employee at the time of the accident was proceeding in the direction of his business destination. If the main trip is personal, a business detour retains its business character through the detour."
> 1 Larson, Workmen's Compensation Law, §19.00.

See also, Mohawk Rubber Co. v. Claimants in Death of Cribbs (1968), 165 Colo. 526, 440 P.2d 785; Adams v. U.S.F.&G. Co. (1971), 125 Ga.App. 232, 186 S.E.2d 784.

The judgment of the Workers' Compensation Court is affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices